United States Court of Appeals,

Fifth Circuit.

No. 94-20386.

Gordon D. SIMMS, et al., Plaintiffs,

Gordon D. Simms, Plaintiff-Appellee,

v.

FIRST GIBRALTAR BANK, et al., Defendants,

First Gibraltar Bank, FSB, now known as First Madison Bank, FSB, Defendant-Appellant.

May 31, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before JOLLY, DAVIS and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this Fair Housing Act case, Gordon D. Simms, a white landlord, contends that First Gibraltar Bank violated the Act when it refused to issue a commitment letter to refinance its existing loan on Simms' apartment complex in a predominantly minority area with a loan to a cooperative housing corporation that probably would be minority owned. We hold that Simms failed to identify any discriminatory policy, procedure, or practice on which to base a discriminatory effects claim. We also hold that Simms failed to adduce sufficient evidence from which a reasonable jury could infer intentional discrimination under a discriminatory treatment theory of liability. Accordingly, we reverse the judgment of the district court and remand for entry of judgment in favor of First Gibraltar.

I

A

Simms owned the Forest Garden Apartments (the "apartment complex"), a fifty-eight unit complex located in a predominantly minority neighborhood in Houston, Texas. Simms purchased the apartment complex in 1979, in part by assuming an existing non-recourse loan from Gibraltar Savings Association ("GSA") secured by a first lien deed of trust on the property. Although GSA waived a

"due-on-sale" clause[1] contained in the deed of trust, the clause continued in effect after the transaction.

Simms encountered numerous difficulties with the apartment complex, including tenant problems and deteriorating conditions. He realized soon after purchasing the apartment complex that it was not producing enough income to make all the necessary repairs. Simms eventually decided to pursue a plan to convert the apartment complex into cooperative housing by rehabilitating and selling it to a cooperative corporation that he planned to establish for that purpose (the "co-op").[2]

B

The Department of Housing and Urban Development ("HUD") rental rehabilitation funds from the city of Houston and permanent financing from National Cooperative Bank ("NCB")[3] became crucial components of Simms' plan. After years of negotiations between the city and Simms, the city agreed that HUD rehabilitation funds could be used for cooperative housing. The city's planning department, by letter dated November 2, 1988, notified Simms that it had retained on its active waiting list his application for rehabilitation funds in the amount of $406,000. As a condition precedent to retaining Simms' application on priority funding status, the planning department imposed a December 17, 1988 deadline on Simms to present evidence of a private lender's commitment to provide matching loan funds for the cooperative rehabilitation. Simms failed to do so.

NCB apparently was to be the source of the matching funds required by the city. In an unexecuted commitment letter[4] dated July 1, 1988, NCB offered to issue a commitment letter

---

[1]A "due-on-sale" clause is a common provision in deeds of trust and mortgages. It gives a lender the right to demand full payment of the balance due on the loan secured by the deed of trust or mortgage if the borrower sells his interest in the property. In effect, it prohibits the would-be buyer of the property from assuming the existing loan without prior approval of the lender.

[2]No cooperative housing existed in Texas at the time Simms was pursuing this plan.

[3]NCB is an independent banking institution chartered by Congress to fund cooperative housing.

[4]A commitment letter conveys the terms and conditions under which a lender promises to extend credit for a particular transaction. An unexecuted commitment letter represents a lender's offer to provide financing. It is not binding on the lender until the would-be borrower accepts it by signing the letter and returning it along with a commitment fee.

evidencing its promise to provide permanent financing for the co-op in the amount of $500,000. Under the terms of the proposed commitment, NCB promised to provide financing if the co-op satisfied, *inter alia,* the following conditions at least sixty days prior to the scheduled closing date of the loan, July 15, 1989: (1) evidence of another lender's commitment of not less than $240,000, (2) a first lien deed of trust on the apartment complex, and (3) proof of $372,000 in committed grant funds from Houston. In another portion of the letter, NCB stated that it would consider a second lien position on a loan equal to or shorter than the first lien loan term at a higher interest rate. Simms had to accept NCB's commitment no later than August 15, 1988, by signing and returning the letter along with a non-refundable commitment fee of one percent of the loan amount, or $5,000. Simms never accepted NCB's offer.

C

On July 19, 1988, Simms spoke to Brenda Tomlinson, an employee of GSA in Houston, about his proposed cooperative conversion. He requested that GSA agree to waive the due-on-sale clause in the deed of trust so that the proposed cooperative corporation could assume the existing loan. GSA's waiver of the due-on-sale clause apparently would have satisfied NCB's condition that another lender commit not less than $240,000 to the project. Tomlinson instructed Simms that because of the scope of the request, a refinancing of the existing loan, i.e., the substitution of a new loan for the existing loan, not a waiver of the due-on-sale clause, would be the appropriate course of action. Simms wrote to Tomlinson in response to this conversation requesting a commitment letter for a new loan of $232,000, at the market interest rate of 10.5%, to replace GSA's existing loan on the apartment complex of $276,000 at 7.25%. Simms indicated in this letter that GSA would retain its first lien on the apartment complex. In other words, Simms was not asking GSA to extend any additional funds—GSA would *receive* $44,000 at closing, plus a higher interest rate on a lower loan balance, and a continued first lien position on a renovated piece of collateral. As a condition to closing on the new loan, Simms proposed pre-sale of fifty of the fifty-eight apartment units in the apartment complex. He included with this letter a summary of the project indicating the city's willingness to provide $400,000 in rehabilitation funds and NCB's willingness to provide permanent

financing in the amount of $500,000.

On November 27, 1988, Simms again contacted Tomlinson concerning his proposal for a commitment letter. Tomlinson told Simms that she was not authorized to review the proposal and that she would forward it to Del Chastain, an asset manager in GSA's Dallas office.[5] Tomlinson sent Chastain a memorandum dated November 30 outlining in general terms Simms' proposal.

Simms apparently called Chastain in early December and then sent him a package on December 7 containing the November 2 letter from the city of Houston, the unexecuted and expired NCB commitment letter, and the financial details of his cooperative conversion plan.[6] Simms stated at the close of the cover letter to the package:

> [T]he Gibraltar refinance would not occur until *after* the property is at least 80 percent sold (or leased with option to buy) to co-op buyers, and construction is completed and approved by city inspectors. At present, only a firm letter of commitment, contingent on the foregoing, is requested.

Simms indicated in this cover letter that GSA would retain its first lien position. He stated that he had been in contact with the city concerning the looming December 17 deadline for supplying the requested commitment letter. Simms stressed that the deadline was actually a "target, not a limit," and gave the name and number of a city official who could provide additional information about the rehabilitation funds and the deadline. He also gave a contact name and number at NCB, although he did not mention the fact that the deadline for accepting NCB's commitment letter had expired.

Simms' package did not contain any information on cooperative housing, even though no co-ops existed in Texas at that time. He did not explain that it was shares in the co-op itself that would be sold to co-op buyers, but instead said in his cover letter to Chastain that the "property" would be sold to co-op buyers. Even the unexecuted NCB commitment letter spoke in terms of

_____

[5]The record shows a dispute as to the cause of the four-month delay after Simms' initial contact with Tomlinson. Simms claimed at trial that he thought Tomlinson was processing the application during that time, asserting that she may have called him at some point. In Tomlinson's memorandum to Chastain dated November 30, 1989, she wrote, "This project was placed on hold after our initial discussion; however, on Monday Mr. Simms advised me they are now proceeding fully and hope to close within 45 days." Simms denied at trial that he placed the application on hold.

[6]Simms was making regular and timely payments on the existing loan at the time of the application and throughout the review period.

"presales of 50 of the 58 units."[7]

In mid-December, Chastain apparently called Simms to discuss the conversion proposal. Simms testified that they had a lengthy conversation, with Chastain asking a number of general questions about the project. Neither Simms nor Chastain, however, could recall many of the details of the conversation.

D

In the meantime, GSA joined the lengthy list of failed savings and loans in Texas. As a result, GSA is no more. On December 28, 1988, in an agreement with the Federal Savings and Loan Insurance Corporation (the "FSLIC"), appellant-defendant First Gibraltar Bank ("First Gibraltar")[8] purchased certain assets of GSA (and four other failed thrifts) from the FSLIC,[9] including the loan on the apartment complex. First Gibraltar did not assume the liabilities of GSA.[10]

At some point in late December or early January, Chastain presented Simms' proposal to Rick Carlton, his supervisor, and Zac Isaacs, legal counsel to the bank. On January 5, 1989, Chastain, who continued in the employ of First Gibraltar, called Simms to inform him that First Gibraltar had rejected his proposal. First Gibraltar never sent a written rejection of the proposal. Simms testified that he was given no reason for this rejection other than that First Gibraltar "did not wish to participate," though he did admit that they "talked in generalities" about the proposal. Chastain apparently told Simms that Simms "would be wasting [his] time" to come to Dallas to talk about the proposal. Chastain allegedly dissuaded Simms from talking to the president of First Gibraltar, Carl

---

[7]Tomlinson was the only person to mention in writing the sale of shares. She stated in her November 30 memorandum to Chastain, "This program would involve reorganizing ownership into a non-profit corporation, and selling shares of the corporation to the tenant/owners."

[8]First Gibraltar changed its name to First Madison Bank in February 1993.

[9]GSA went into FSLIC receivership in late 1989.

[10]The precise relevance of evidence relating to GSA's conduct in the processing of Simms' application is somewhat problematic given the fact that First Gibraltar did not assume GSA's liabilities.

Webb.[11]  Simms testified that he considered his proposal "dead" and thus did not take any other action in the immediate aftermath of First Gibraltar's rejection.  Simms did not approach any other lenders about his proposal.

E

The deterioration of the apartment complex accelerated over the ensuing months.  A rainstorm in October 1989 was the "coup de grace" according to Simms—leaking roofs made most of the units uninhabitable.  Simms again contacted First Gibraltar in October.  He wro te a series of letters to Webb and had numerous telephone conversations with various First Gibraltar officials.  He apparently notified the bank that he could no longer make the payments on the loan and offered the bank a quitclaim deed to the property.  The bank allegedly insisted that Simms continue to manage the property and look for a buyer.  In October 1990, First Gibraltar accepted a no-strings $81,000 offer from a third party for its deed of trust on the property, after rejecting an earlier offer of $90,000 that required the bank to provide interim financing for another proposed upgrade.

II

A

In November 1989, Simms filed complaints with the Office of Thrift Supervision and HUD against First Gibraltar, alleging that racial animus motivated First Gibraltar's denial of his proposal.  After both agencies found no evidence of discrimination, Simms and two former apartment complex residents filed suit in the United States District Court for the Southern District of Texas against First Gibraltar, alleging, *inter alia,* violations of the Fair Housing Act (the "FHA").  The district court dismissed the claims of the two former residents for lack of standing.

Simms stipulated before trial that he was not attempting to prove that First Gibraltar violated

---

[11]Simms asserted that Chastain refused to give the name and number of Webb, though he did admit that Chastain told him that the president would simply refer Simms back to Chastain.  Webb testified that he normally did not become involved in the lending process.  "We had many, many lending relationships and I don't think that that is what the president of a banking organization does."

the FHA under a "redlining" theory,[12] though the racial composition of the area in which the apartment complex was located—a critical part of a traditional "redlining" case—played a crucial role in his argument. Instead, Simms' theory of the case was that First Gibraltar violated the FHA by refusing to give him a commitment letter because it did not want to issue a new loan to a co-op that probably would be minority-owned to replace the existing loan to him, a white landlord. He also argued that First Gibraltar violated the FHA because of the discriminatory effects of its decision not to issue a commitment letter.

B

First Gibraltar presented no contemporaneous written record of its handling of the proposal or its reasons for the rejection. The testimony of Chastain, the only First Gibraltar official directly involved in the rejection of Simms' proposal who testified at trial, is thus crucial to our review because it is the only direct evidence in the record of First Gibraltar's handling of the proposal and its reasons for rejecting it.

Chastain acknowledged that neither he nor First Gibraltar had any experience in cooperative housing, and that he did not understand how co-ops worked. He also acknowledged that Simms' proposal confused him. "[Q]uite a bit of the material that he supplied to me ... was not real clear and we were never able to make some of the points clear as to what his proposal really was for."

Although Chastain admitted that the bank would have had great interest in the proposal had it retained its first lien position, he testified that the documentation that Simms submitted did not lead him to believe that the bank's first lien would be secure. Chastain's doubts stemmed from two sources. First, he allegedly believed that the sale of the apartment units—the fifty units that had to be sold as a condition to closing on the refinancing—would diminish the collateral securing First Gibraltar's loan on the apartment complex. In other words, he thought that only eight of the

---

[12]"Redlining means "mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling.' " *Cartwright v. American Savings & Loan Association,* 880 F.2d 912, 913 n. 1 (7th Cir.1989) (quoting *Thomas v. First Federal Savings Bank of Indiana,* 653 F.Supp. 1330, 1337 (N.D.Ind.1987)). The term derives from loan officers evaluating home mortgage applications based on a residential map where integrated and minority neighborhoods are marked off in red as poor risk areas. Robert G. Schwemm, *Housing Discrimination* 13-42 (Release # 5, 1995).

fifty-eight units after the conversion to cooperative housing would secure First Gibraltar's loan.[13]  The written documentation appeared to confuse even Simms' own expert witness, Champney Smith.[14] Chastain also testified that he did not think that these eight remaining units would have been rehabilitated,[15] though Simms' counsel pointed to a provision in the NCB letter that effectively guaranteed rehabilitation of the entire complex.[16]  Second, Chastain concluded from NCB's letter that NCB required a first lien on the property.  When Simms' counsel confronted Chastain with that portion of the NCB letter stating that NCB would consider a second lien, Chastain merely responded that he would have to re-read the entire letter.[17]  Chastain further testified that he was concerned that a co-op of which First Gibraltar had no knowledge or record would be responsible for managing its collateral.  "[I]t would put the bank in a lesser position so far as the collateral was concerned...."

Chastain claimed that the bank rejected the proposal also because it did not make "economic

---

[13]Over First Gibraltar's strenuous objection, the district court would not allow First Gibraltar to explore fully this particular reason because it was based on a "false premise."  Chastain's testimony does exhibit a misunderstanding about the organizational structure of a co-op.  As indicated earlier, however, the record shows there was no cooperative housing in Texas at the time and neither GSA nor First Gibraltar had any experience with cooperative housing loans.  The record also shows that Simms failed to provide any explanation of co-ops in his application, and affirmatively misstated that the "property" would be sold to co-op buyers.  A co-op buyer in fact purchases shares in the cooperative corporation and the right to lease a particular unit.  The cooperative corporation actually owns the property and finances its ownership of the property with a blanket mortgage secured by the property.  The sale of interests in the co-op does not diminish a lender's underlying security interest in the property.

[14]After examining selected portions of the proposal at the request of Simms' counsel, Smith stated:

> I would want to see a spreadsheet showing the partial-release clause and the cash flow as to *the remaining collateral after each sale.*  But with that caveat, I would have no problem going forward with it.

[15]He testified:

> We would have whatever the remaining number of apartment units left that would not be complete, that would not be completed, there was no provisions in anything that those would be completed and we would be left holding the bag with whatever that remaining 20 percent was and looking to a co-op to complete it.

[16]The provision required that the co-op place in escrow 150 percent of the estimated cost of unfinished repairs at the time of closing.

[17]Both Chastain's supervisor and Zac Isaacs supposedly agreed at the time of the rejection that the proposal did not protect First Gibraltar's first lien position.

sense" at the time. He gave a number of reasons for this conclusion. First, he stressed that both the city's and NCB's commitments remained unfulfilled.[18] He noted that the NCB letter was unsigned and that the time limit in the city's letter had expired. "They were undocumented as far as I am concerned." Smith, Simms' expert witness, agreed that a prudent lender would request an executed or "bankable" commitment letter, and admitted that it would not be imprudent to deny a proposal based on an unexecuted, expired commitment letter. But he also asserted that it would not make sense for Simms to pay the $5,000 commitment fee to obtain a "bankable" commitment letter from NCB if Simms were unsure whether First Gibraltar would participate in the conversion plan.

Although Simms told Chastain that he could call NCB and the city about their offers, Chastain repeatedly stressed during his testimony that he did not have the resources to do the legwork for a customer on a proposal; furthermore, there was no evidence that it was customary to do so. "I was relying on the customer like all other workouts to provide me with the necessary information to make an intelligent decision on it. This information was not supplied to me. I told Mr. Simms it was not there. I never did receive anything else." Chastain claimed that he asked Simms for up-to-date information about the commitment letters, but Simms denied ever being asked for such information and asserted that he would have been willing to provide such information if Chastain had requested it. Smith, Simms' expert witness, asserted that it was the borrower's responsibility to provide information about a deal; he admitted that a lender does not have an obligation to obtain information if it asks the borrower for such information and the borrower does not supply it.

The second reason why the proposal did not make "economic sense," according to Chastain, was that there appeared to be a shortfall in financing for the rehabilitation of the apartment complex.[19] Third, Chastain claimed that he was concerned about the proposal because of the length of time—five

---

[18]Simms testified that Chastain never told him that First Gibraltar rejected the proposal because the formal requirements of the commitment letters were unsatisfied.

[19]The financial details that Simms submitted to Chastain in early December showed that he needed $637,000 to rehabilitate the property. Chastain claimed that there was a shortfall of over $200,000 because the city rehabilitation grant was only for $406,000. He apparently did not understand that NCB's permanent financing was to be the source of the additional rehabilitation funds, although Chastain had, of course, no guarantee that NCB would supply the permanent financing because NCB's commitment letter remained unexecuted and had expired.

years—it took for Simms to obtain funding for the rehabilitation, though he later admitted that he did not know whether that was a normal or abnormal period to get approval for a housing grant. Fourth, he pointed to the lack of experience with cooperative housing in the area.

Simms' counsel attempted to elicit from Chastain his reason for not issuing a commitment letter that made the refinancing contingent on resolution of First Gibraltar's concerns about the proposal. Although Chastain admitted that he could have issued such a commitment letter, he declared that he did not do so because "the workout was not a good workout or good proposal with the information that had been supplied." Smith, Simms' expert witness, testified that a lender might issue a commitment letter with a condition that overcame an objection to a proposal, but admitted that if a lender had a number of concerns, negotiations were more appropriate. Smith also admitted that he would not issue a commitment letter if a deal did not make "economic sense."

Simms' counsel tried to impeach Chastain's testimony by asking him about an affidavit Chastain made in late 1989 during the HUD investigation into the rejection.[20] After showing the affidavit to Chastain, Simms' counsel questioned Chastain about various reasons appearing in the affidavit. First, he asked Chastain why he had stated that the deteriorated condition of the property was a reason for the rejection when Chastain had acknowledged that disrepair was not a good reason to deny a proposal to improve property.[21] Second, he asked Chastain why he had claimed in the affidavit that it would have cost more than the entire loan basis to remove the asbestos in the apartment complex. Chastain admitted earlier in his testimony that he just assumed that asbestos was present based on the age of the apartment complex, even though he did not know the exact age of the property, and admitted "[t]here has been nothing confirmed" on the need for spending any money on an asbestos rehabilitation. Finally, Simms' counsel asked Chastain why he had declared that Simms' failure to keep up the property was a reason for the rejection when neither he nor any other employee of First Gibraltar had inspected the apartment complex.

---

[20]The affidavit was not admitted into evidence.

[21]Chastain admitted that he did not have first-hand knowledge of the condition of the property.

Simms' counsel also attempted to show that Chastain did not process Simms' application in a customary manner. Simms' counsel first questioned Chastain about the procedure for processing workout proposals. Chastain testified that he first analyzed the proposal, which had to contain a list of the repairs and estimated costs. He then would inspect, or send a field inspector to inspect, the property to determine whether the proposed repairs were necessary and justifiable. Finally, he would present the proposal to his supervisor for a decision.[22] When asked why he did not make an inspection of the property, Chastain testified that "we didn't progress that far along on it. There was not enough information there to warrant us getting that involved in it."[23]

Neither side presented evidence of any other workout proposal submitted to First Gibraltar around the time of, or even after, First Gibraltar's rejection of Simms' proposal. Although Chastain mentioned that the bank was engaged actively in workouts[24] of existing loans in November 1989—some ten months after the rejection of Simms' proposal—the record does not reveal the level of activity in the early months of 1989; First Gibraltar apparently made only one new loan in 1989.[25]

## C

At the close of the evidence, the district court instructed the jury on discriminatory treatment and discriminatory effects (or disparate impact) theories of liability under sections 804(b) and 805 of the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3605, and submitted interrogatories to the jury ostensibly based on each theory. The jury found First Gibraltar liable under both theories and awarded $1.21 million in compensatory damages and $2 million in punitive damages. On April 18,

---

[22]First Gibraltar apparently did not have a formal loan review committee when it rejected Simms' proposal because the newly-chartered bank was not making any new loans. Chastain testified, however, that there was an informal "committee" or process for reviewing workout proposals on existing loans. He indicated that he would present them to his supervisor, and they would decide whether to approve them.

[23]Chastain did testify, though, that he had enough information to submit Simms' proposal for consideration.

[24]Chastain explained that the typical workout proposal involved a request for additional funds to make repairs to a distressed property in order to make it marketable.

[25]There are no details on this loan in the record other than the borrower's name and the amount.

1994, the district court set aside its earlier order dismissing the former residents' claims and severed these claims from those of Simms. First Gibraltar appeals from the final judgment and from the district court's April 18 order.[26]

### III

The crucial question presented is whether the record contains sufficient evidence to support the jury's verdict that First Gibraltar violated sections 804(b) and 805 of the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3605. Section 3604(b) provides that it is unlawful "[t]o discriminate against any person in the terms, co nditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race." 42 U.S.C. § 3604(b) (1994). Section 3605 provides that it is unlawful for any "entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction ... because of race." 42 U.S.C. § 3605(a) (1994). "Residential real estate-related transactions" include "the making ... of loans or providing other financial assistance—for purchasing, constructing, improving, repairing, or maintaining a dwelling; or secured by residential real estate." 42 U.S.C. § 3605(b)(1). Simms sought recovery under both discriminatory treatment and discriminatory effects theories of liability. He relied on both of these theories to support claims under both § 3604 and § 3605.[27]

---

[26]Simms filed a motion to strike that portion of First Gibraltar's appeal concerning the district court's April 18 order. This court carried Simms' motion with the case in an order dated July 22, 1994. First Gibraltar has abandoned any issue or argument in this appeal concerning the district court's April 18 order because it did not argue any error with respect to this order in its briefs before this court. *See* Fed.R.App.P. 28(a)(5) ("The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor"); *Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir.1993) (holding that appellant abandoned argument by failing to argue it in body of brief). We therefore dismiss Simms' motion to strike as moot.

[27]First Gibraltar contends that because Simms' complaint concerned only the availability of financing under § 3605, and not the availability of housing under § 3604(b), § 3605 is the only relevant provision. Simms argues that he was entitled to pursue the § 3604(b) claim because his tenants were denied the opportunity to purchase a dwelling. Simms' argument raises a standing question that appears to have been addressed neither by the parties nor by the district court. *See Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 263-64 & n. 9, 97 S.Ct. 555, 562 & n. 9, 50 L.Ed.2d 450 (1977) (refusing to address standing of a corporation to assert rights of its prospective minority tenants because of presence of one individual plaintiff who demonstrated standing). Even if we were to determine that Simms had standing to bring a § 3604(b) claim, the plain language of the two provisions seems to indicate

Simms argued at trial that First Gibraltar refused to issue him a commitment letter promising to replace its existing loan to him, a white landlord,[28] with a new loan to the proposed co-op that probably would have been minority-owned because of the racial composition of the current tenants of the apartment complex and its location in a predominantly minority area.[29] We address initially that portion of the jury's verdict finding that First Gibraltar violated the FHA based on a showing of discriminatory effects.

A

that § 3605 is the vehicle for discrimination claims involving the financing of residential housing. *See Mackey v. Nationwide Insurance Companies,* 724 F.2d 419, 423 (4th Cir.1984) ("If § 804 was designed to reach every discriminatory act that might conceivably affect the availability of housing, § 805's specific prohibition of discrimination in the provision of financing would have been superfluous"); *but see Laufman v. Oakley Building & Loan Co.,* 408 F.Supp. 489, 493 (S.D.Ohio 1976) ("[A] denial of financial assistance in connection with a sale of a home would effectively "make unavailable or deny' a "dwelling' " in violation of § 3604(b)). Because of the result we reach today, it is unnecessary for us to address these matters.

[28]First Gibraltar concedes that Simms has standing to bring an action in his own behalf under § 3605 of the FHA. The FHA states, "An aggrieved person may commence a civil action in an appropriate United States district...." 42 U.S.C. § 3613 (1994). It defines an "aggrieved person" as "any person who claims to have been injured by a discriminatory housing practice." 42 U.S.C. § 3602(i)(1). A "discriminatory housing practice" is "an act that is unlawful under section 3604, 3605, 3606, or 3617 of this title." 42 U.S.C. § 3602(f). *See Old West End Association v. Buckeye Federal Savings & Loan,* 675 F.Supp. 1100, 1102 (N.D.Ohio 1987) (white homeowners have standing to maintain discrimination actions for injuries suffered by them as a result of racially discriminatory housing practices).

[29]Although Simms argued in his briefs and at oral argument that the denial of his conversion proposal on January 5, 1989, was but one of a series of discriminatory acts at issue in this case extending from December 1988 through October 1990, "when First Gibraltar maliciously filed a bad credit report against Simms," the record makes clear that the only triable issue in the case was, and is, whether First Gibraltar's denial on January 5 violated the FHA. Indeed, when First Gibraltar was putting on its defense, the district court prohibited First Gibraltar from questioning Scott Gesell, First Gibraltar's compliance officer, about allegations in Simms' case-in-chief concerning the credit report by stating, "[W]hat does it have to do with the fact Mr. Simms presented a proposal a year and a half, two years earlier and was turned down. This case is about the proposal.... Whether or not he was justified in [filing the credit report] is not an issue in this case. Will not be an issue presented to the jury." Neither party disputed this ruling. The district court admitted evidence of the incidents after January 5, upon which Simms now expounds as having some independent relevance, solely for the purpose of showing the effects of the denial on January 5. Furthermore, the jury instructions indicate that it was the rejection of the proposal on January 5 that was at issue in the case. For example, the instructions state that Simms "asserts that First Gibraltar violated federal law when they [sic] failed and refused to review and/or failed to give the usual and customary review to *his proposal.*" The instructions also state that "[y]ou may find that a discriminatory housing practice on the part of First Gibraltar existed if you find from a preponderance of the evidence that Simms' *request for loan modification* was handled in a [different] manner."

First Gibraltar argues that Simms did not present sufficient evidence to support a finding that the bank violated the FHA based on a showing of discriminatory effects. It also argues that the district court improperly instructed the jury on the standard for finding a violation of the FHA under a discriminatory effects theory. First Gibraltar in essence contends that this record simply does not present a discriminatory effects case. Simms, on the other hand, argues that he proved discriminatory effects by showing that First Gibraltar's rejection primarily affected minorities. First, virtually all of the prospective owners of the planned cooperative units would have been minorities. Second, the cooperative project would have benefited the predominantly minority community in which it would have been located.

We agree that a violation of the FHA may be established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect. *Hanson v. Veterans Administration,* 800 F.2d 1381, 1386 (5th Cir.1986). The relevant question in a discriminatory effects claim against a private defendant, however, is not whether a single act or decision by that defendant has a significantly greater impact on members of a protected class, but instead the question is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class. *See Anderson v. Douglas & Lomason Co., Inc.,* 26 F.3d 1277, 1284 (5th Cir.1994) (Title VII), *cert. denied,* --- U.S. ----, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995). In this case, Simms does not identify an alleged discriminatory policy, procedure, or practice of First Gibraltar, much less provide evidence, statistical or otherwise, that such policy, procedure, or practice had a significantly greater impact on members of a protected class.

We therefore conclude that Simms did not present sufficient evidence to establish a violation of the FHA under a discriminatory effects theory of liability. We next turn to examine that portion of the jury's verdict finding that First Gibraltar violated the FHA based on a showing of discriminatory treatment.

B

First Gibraltar contends that the evidence is insufficient to support the jury's finding of discriminatory treatment in violation of the FHA. We agree.

(1)

We recently held in the Age Discrimination in Employment Act ("ADEA") context that

> [t]o sustain a finding of discrimination, circumstantial evidence must be such as to allow a rational factfinder to make a reasonable inference that age was a determinative reason for the employment decision.... [A] jury issue will be presented and a plaintiff can avoid summary judgment and judgment as a matter of law if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer *and* (2) creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains.

*Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (en banc) (emphasis added). The holding in *Rhodes* may be appropriately applied to this FHA case in which the question is whether the plaintiff presented sufficient evidence for the jury to make a reasonable inference that race motivated First Gibraltar's rejection of Simms' proposal. We thus will sustain the jury verdict if the evidence taken as a whole, when viewed in the light most favorable to the verdict, *Jones v. Wal-Mart Stores, Inc.,* 870 F.2d 982, 987 (5th Cir.1989), (1) creates a fact issue as to whether each of First Gibraltar's stated reasons for refusal actually motivated First Gibraltar *and* (2) creates a reasonable inference that race was a significant[30] factor in the refusal.

It is not enough merely to create a fact issue as to each of First Gibraltar's reasons for refusing to issue a commitment letter. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 524-25, 113 S.Ct. 2742, 2756, 125 L.Ed.2d 407 (1993) ("Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of ... race"). The evidence taken as a whole must also create a reasonable inference that race was a significant factor in the refusal. *See Polanco v. City of Austin, Texas,* 78 F.3d 968, 977-78 (5th Cir.1996) (making same observation in Title VII context). First Gibraltar's refusal may have been unsound, unfair, or

---

[30]The protected trait must only be "one significant factor" in the challenged decision to violate the FHA. *Woods-Drake v. Lundy,* 667 F.2d 1198, 1202 (5th Cir.1982). Our decision in *Hanson* explained that "it is enough to show that race was a consideration and played some role in a real estate transaction." 800 F.2d at 1386 (citation omitted). The ADEA, on the other hand, requires that age be a "determinative factor" in the challenged decision. *Rhodes,* 75 F.3d at 994; *see Hazen Paper Company v. Biggins,* 507 U.S. 604, 610-11, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) ("[A] disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome"). We find it unnecessary to explore the difference between these two causal formulations.

even unlawful, yet not have been violative of the FHA if there is no evidence from which a jury reasonably could infer that race was a significant factor in First Gibraltar's decision. *See Hazen Paper,* 507 U.S. at 611-13, 113 S.Ct. at 1707 (making similar observations in ADEA context); *Rhodes,* 75 F.2d at 994 (same).

(2)

We now turn to the record in this case. Simms argues that the evidence establishing a prima facie case of discrimination and discrediting each of First Gibraltar's proffered reasons for refusal, along with evidence of what he characterizes as First Gibraltar's "arbitrary and unreasonable" conduct, is sufficient for a reasonable jury to infer that race was a significant factor in First Gibraltar's refusal to issue a commitment letter.

In the light most favorable to the verdict, the evidence establishes that Simms sought a commitment letter for the refinancing of an existing loan on property located in a predominantly minority area. It also establishes that Simms applied for a commitment letter, that the proposal qualified for a commitment letter, and that First Gibraltar refused to issue the commitment letter despite the merits of the proposal. Simms, however, proffered no evidence of First Gibraltar's lending activity around the time of, or even in the months immediately after, the rejection of his proposal. He did introduce evidence, albeit conclusory and brief,[31] that indicated that First Gibraltar was "actively engaged" in rehabilitation and workout modifications and funding in November 1989, ten months after the rejection of Simms' proposal. This evidence did not indicate whether the rehabilitation and workout modifications and funding were of a type similar to Simms' proposed refinancing. In fact, all details of these transactions are notably absent from the record, including the number of such transactions, the areas in which this lending activity occurred, and the race of the borrowers involved.

Our review of the record persuades us nevertheless that there was at least a fact issue as to whether First Gibraltar's articulated reasons for the rejection—that First Gibraltar's first lien position

---

[31]Simms merely asked Chastain whether First Gibraltar was involved in "lots of workouts" in November 1989; he received an affirmative response.

would be jeopardized and that the proposal did not make "economic sense," i.e., Houston's and NCB's commitment letters remained unfulfilled, an alleged shortfall in financing, the length of time it took to put the deal together, and the lack of experience with cooperative housing in the area—were the real reasons for the rejection. First, First Gibraltar gave no specific reasons at the time of the rejection. Second, a reasonable jury could have discounted Chastain's concern that First Gibraltar's first lien position was in doubt. The sale of individual cooperative units would not have diminished First Gibraltar's collateral. Also, NCB did not require First Gibraltar to give up its first lien on the apartment complex as a condition to NCB extending permanent financing to the co-op; the NCB letter clearly indicates that NCB would consider a second lien at a higher interest rate. Third, a reasonable jury also could have discounted Chastain's contention that the proposal did not make economic sense inasmuch as Simms' proposal would have reduced First Gibraltar's exposure on the apartment complex and increased the interest rate on the remaining loan balance. Finally, Simms' efforts to impeach Chastain with Chastain's earlier affidavit to HUD could have led a reasonable jury to question other portions of Chastain's testimony.[32]

Simms also adduced the following evidence at trial, evidence of what he characterizes as First Gibraltar's "arbitrary and unreasonable" conduct: First Gibraltar did not give Simms written reasons for the rejection; Chastain dissuaded Simms from meeting with him or contacting the president of First Gibraltar after the January 5 rejection; Chastain did not actively solicit remedial action by Simms to save the proposal after the rejection; First Gibraltar did not inspect the property before rejecting the proposal; and Chastain submitted an incomplete application to his superior for consideration.

(3)

Even though Simms' evidence satisfied *Rhodes'* first requirement by creating a fact issue as to whether each of First Gibraltar's stated reasons for refusal actually motivated First Gibraltar, the evidence Simms offered is insufficient to satisfy *Rhodes'* second requirement. A thorough review of

---

[32]Simms claims on appeal that the inconsistencies between Chastain's testimony and his earlier affidavit to HUD are evidence of discrimination because they amounted to "false representations to thwart efforts of Simms to obtain relief under the Fair Housing Act from HUD."

the record makes plain that a reasonable jury could not infer from the evidence as a whole that race was a significant factor in First Gibraltar's refusal to issue a commitment letter.[33]

Indeed, when the evidence is viewed in its full context, it is not compelling that Simms' application was treated in a highly unusual manner. First, there is no evidence that First Gibraltar was engaged in any workout or rehabilitation activity around the time of the rejection—Simms' evidence only establishes that First Gibraltar was engaged in some undefined workout activity in November 1989, ten months after the rejection. This lack of evidence particularly weakens Simms' argument in the light of the fact that First Gibraltar had just come into existence through the purchase of the assets of GSA and four other lending institutions eight days before Simms' rejection, and was, thus, in a transitional period. Second, First Gibraltar had never financed a cooperative housing project, and no cooperative housing existed in Texas, at the time of the rejection. Third, Simms' proposal was not properly documented. For example, Simms included the unexecuted and expired NCB commitment letter—unexecuted because Simms did not want to pay the commitment fee—without any explanation in his cover letter, even though the cover letter discussed the looming deadline for the city's commitment. His application also contained no explanation of cooperative housing, and, in fact, the cover memorandum to Chastain dated December 7 affirmatively misrepresented what co-op buyers purchase by declaring that closing would occur after "the *property* is at least 80 percent sold."

Simms' evidence of First Gibraltar's "arbitrary and unreasonable" conduct is also insufficient for a reasonable jury to infer that race was a significant factor in the rejection. The fundamental flaw in this evidence is that Simms offered it in a vacuum; he presented absolutely no evidence that other, "non-protected" applicants or applications were treated any differently around the time of Simms' rejection. *See McDonnell Douglas v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) (ruling that retention or rehiring of white employees engaged in similar acts of misconduct would be especially relevant to showing of pretext). Simms also did not present any evidence from

---

[33]Unlike the defendants in *Hicks* and *Rhodes,* First Gibraltar strenuously denies that the record contains sufficient evidence for a reasonable jury to conclude that Simms established a prima facie case of lending discrimination. *See Hicks,* 509 U.S. at 507-509, 113 S.Ct. at 2747; *Rhodes v. Guiberson Oil Tools,* 39 F.3d 537, 547 (5th Cir.1994) (dissenting opinion) (reversed en banc).

which it might be inferred that First Gibraltar had a poor record of lending in minority areas or to minorities;[34] furthermore, there was not the slightest evidence of racial bias presented on the part of any of First Gibraltar's personnel. Although Simms' expert, Smith, testified that it was industry custom to provide written notification of a rejection, and the district court ruled that First Gibraltar was required to give written notification of the rejection under Regulation B of the Equal Credit Opportunity Act,[35] failure to provide written notification to Simms is insufficient to infer a racial motive on the part of First Gibraltar without some showing that other, "non-protected" applications were treated differently. In other words, failing to follow industry custom or federal regulations is not evidence from which a jury could infer racial animus unless Simms showed that First Gibraltar normally conformed with industry custom or complied with federal regulations in handling similar, "non-protected" applications. The same is true for Chastain's efforts to dissuade Simms from meeting with Chastain or talking with the president after the rejection, and Chastain's failure to actively solicit Simms to remedy what Chastain saw as the proposal's flaws.

Evidence of First Gibraltar's failure to inspect the property is similarly flawed. Simms merely elicited generalized testimony from Chastain about customary procedures for handling workout proposals from other bank customers requesting additional money to make needed repairs to existing property. Simms' proposal actually did not fall into that category, however, because he was seeking a refinancing of an existing loan from First Gibraltar that would actually reduce their exposure on the apartment complex, not additional money for repairs. Thus, the fact that First Gibraltar did not inspect the property to determine whether the requested repairs were actually needed, a customary step in reviewing a workout proposal, does not permit an inference of intentional discrimination in this case. The same is true for the submission of the incomplete application to Chastain's superior.

---

[34]Scott Gesell, First Gibraltar's compliance officer, testified that First Gibraltar made a total of eight loans in the census tract encompassing the apartment complex in 1989. He indicated that six were home improvement loans; all he knew about the other two was that they were secured by real property.

[35]We need not reach the issue whether the district court erred as a matter of law when it concluded that First Gibraltar's failure to give written notice of its rejection constituted a violation of the Equal Credit Opportunity Act.

The ultimate burden of persuasion that race was an intentional and significant factor in rejecting Simms' proposal was squarely on Simms. *Hicks,* 509 U.S. at 507-509, 113 S.Ct. at 2747. Given that the burden of proof was on Simms—and not on First Gibraltar to disprove the existence of race as a significant factor in the decision—we simply cannot conclude that a reasonable jury could infer from the evidence as a whole that race was a significant factor in First Gibraltar's refusal to issue a commitment letter.

IV

We thus sum up: The FHA does not create a cause of action for bungling a deal, failing to follow industry custom, violating the Equal Credit Opportunity Act, or even making false representations to a government agency. *See Hazen Paper,* 507 U.S. at 611-13, 113 S.Ct. at 1707 (making similar observations in ADEA context); *Hicks,* 509 U.S. at 521, 113 S.Ct. at 2754 ("Title VII is not a cause of action for perjury"). The FHA instead prohibits a lending institution from using race, or any other prohibited factor, as a basis for making a lending decision. Our holding today is therefore relatively narrow and simple: evidence of a bank's refusal to issue to a white landlord a commitment letter to refinance an existing loan in a predominantly minority area with a loan to a co-op that probably would be minority owned, along with evidence discrediting the bank's articulated reasons for refusing to issue the letter, and evidence of less than thorough handling that does not conform generally to customary industry practices, will not support an inference of intentional discrimination without some evidence that similar "non-protected" applications have received dissimilar treatment.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for entry of judgment in favor of First Gibraltar.[36]

REVERSED and REMANDED.[37]

---

[36]Because we dismiss for lack of evidence, we do not reach the other issues raised by First Gibraltar on appeal.

[37]We DENY Simms' motion under Rule 38 of the Federal Rules of Appellate Procedure to recover costs and damages. We also DISMISS as moot Simms' motion to disregard misrepresentations of fact and law in First Gibraltar's reply brief and assertions of error in its reply brief not asserted in its original brief.

EMILIO M. GARZA, Circuit Judge, concurs as to the judgment only.