**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**CITY OF BIRMINGHAM, MICHIGAN,
Defendant-Appellant.**

**No. 82–1559.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 7, 1983.
Decided Feb. 8, 1984.

William M. Saxton, argued, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., Dean G. Beier, Beier, Howlett, McConnell, McCann, Bloomfield Hills, Mich., for defendant-appellant.

Leonard R. Gilman, U.S. Atty., Detroit, Mich., William R. Yeomans, argued, Brian Heffernan, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before MERRITT, Circuit Judge, PHILLIPS, Senior Circuit Judge, and SPIEGEL, District Judge.*

PHILLIPS, Senior Circuit Judge.

This fair housing case was filed by the Civil Rights Division of the Department of Justice against the City of Birmingham, Michigan, charging that the City had prevented the development of racially integrated low-income senior citizen and family housing by Baldwin House, a private corporation, in violation of the Civil Rights Act of 1968 (the Fair Housing Act). 42 U.S.C. §§ 3604(a) and 3617.[1]

---

\* The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

1. **§ 3604. Discrimination in sale or rental of housing**

   As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

**§ 3617. Interference, coercion, or intimidation; enforcement by civil action**

   It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the

In an opinion containing comprehensive findings of fact, District Judge Robert E. DeMascio issued an injunction restraining the City from interfering further with the efforts of Baldwin House, a non-profit corporation formed by members of five different Birmingham churches, to construct low-income family and senior citizen housing within the City of Birmingham.

Reference is made to the opinion of the district court, published in 538 F.Supp. 819 (E.D.Mich.1982) for a detailed recitation of pertinent facts. We affirm the judgment of the district court except for one modification in the injunction as hereinafter set forth in part VI of this opinion, *infra.*

## I

Birmingham, a suburb of Detroit, Michigan, has a population of approximately 22,-000, with a very small minority ratio. According to the 1980 federal census only forty-four (0.2%) of its citizens were black. The City of Birmingham was aware of an acute shortage of senior citizen housing as early as 1969. Attempting to meet this need, in 1975, after competitive bidding, the City accepted a proposal submitted by Baldwin House by which the City would sell to Baldwin House a recently acquired school site. The proposal called for the construction and management of 156 units (later reduced to 152) of senior citizen housing on the former site of the Baldwin School. Baldwin House proposed to finance construction through the Michigan State Housing Development Authority (MSHDA) and planned to seek tenant rent subsidies under the Section 8 program of the Department of Housing and Urban Development.

The sale required voter approval. At a referendum held April 5, 1976, the voters of the City overwhelmingly approved the sale of the Baldwin School site to Baldwin House. The district court found as follows:

On December 6, 1976, Birmingham entered into an agreement for the sale to Baldwin House of the former Baldwin School site. Paragraph I(G) of the agreement provided:

The City acknowledges that federal and state policy requires that non-elderly government assisted housing as well as assisted elderly housing be provided in each housing market area. Therefore, the City agrees it will consider such existing, rehabilitated and/or *new housing* as the Michigan State Housing Development Authority and/or U.S. Department of Housing and Urban Development shall reasonably require as a condition of providing financing and assistance to the Baldwin House project.

The agreement gave Baldwin House one year to obtain MSHDA financing. Thus, prior to signing the agreement, the City Commission knew that MSHDA would require some "family housing" as a condition for financing the construction of senior-citizen housing. City officials also knew that MSHDA would probably require some new construction of family housing.

On February 25, 1977, Baldwin House submitted its first request to MSHDA for financing the construction of family housing (50 units on one site with a possible additional 10 units on a second site). In March 1977, less than 90 days after the City signed its agreement with Baldwin House, MSHDA officials informed Mr. Watchowski, the City Grant Administrator, that, as part of its newly announced balanced housing policy, MSHDA would require one unit of low-income family housing for every two units of senior-citizen housing as a condition for financing construction of senior-citizen housing.

538 F.Supp. at 822 (footnotes omitted).

After numerous developments described in detail in the district court's opinion, 538 F.Supp. at 822 to 824, the district court found that "Soon after the public had been

exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of,

any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.

advised that Baldwin House intended to construct low-income family housing, opposition began to surface. Most of the opposition to the proposal centered on fears that family housing might introduce 'harmful elements' into Birmingham." 538 F.Supp. at 824. Opposition to low-income housing was expressed at meetings of the City Commission. Flyers were distributed throughout the City, vigorously attacking the Baldwin House plan. The district court found that "[r]esidents who opposed the Baldwin House proposal attended every Commission meeting between November 1977 and April 1978"; and that they expressed concern about "those people" coming to Birmingham. *Id.* The court concluded: "We find that when the group led by Nancy Elby referred to 'those people,' they were referring to black people." *Id.* The court found that the City Commission took action that supported opponents of the Baldwin House proposal by agreeing to defer a final vote on extending the Baldwin House contract and by adding several amendments to the proposed contract that made it impossible for Baldwin House to continue its negotiations successfully with MSHDA. *Id.* at 825.

An advisory referendum on the Baldwin House proposal was held on April 3, 1978, when three of the seven members of the City Commission stood for reelection. The Baldwin House proposal and the three incumbent Commissioners were defeated. Three candidates opposing the proposal were elected. The district court found:

> The City's interference with the Baldwin House proposal culminated when on May 8, 1978 . . . the three remaining Commissioners who supported the Baldwin House proposal were recalled from office. This newly composed Commission never took any action to repair the damage its practices and policies had done to the negotiations between MSHDA and Baldwin House. Even though the new Commission was aware that Baldwin House wanted its contract extended at least until September 1978, it took no action. It would have served no purpose for Baldwin House to again request an extension; it knew it had no support on the new

Commission. A city that had actively interfered with the Baldwin House/MSHDA negotiations could now preclude construction of racially integrated family housing in Birmingham by simply doing nothing.

538 F.Supp. at 826.

The district court held that "the City's interference with the Baldwin House plan to construct low-income housing was, in fact, racially motivated." *Id.*

Judge DeMascio then articulated seven specific factors in support of his conclusion. These seven factors are set forth in the quotation in Part IV of this opinion, *infra.*

We find the conclusion of the district court on these seven factors to be supported by the record. Reference is made to the findings of fact of the district court for comprehensive details of evidence supporting the court's conclusion on these seven factors.

## II

The City urges reversal of the judgment of the district court on the following grounds:

(1) The findings of fact upon which the district judge based his ultimate conclusion that the City blocked the Baldwin House development with a racially discriminatory intent is based upon hearsay evidence and are clearly erroneous;

(2) That the district court unlawfully inquired into the motives of voters who participated in the April 3, 1978 advisory referendum on the sale of the Baldwin school site to the Baldwin House group;

(3) That the district court erred in holding that the City acted with a discriminatory intent is erroneous and contrary to law; and

(4) That the remedy prescribed by the district court is not limited to the nature of the violation found.

We address each of these contentions in turn.

## III

█ This court may set aside findings of fact of a district judge sitting without a jury only if the findings are "clearly erroneous." Fed.R.Civ.P. 52(a). To set aside such findings of fact, we must be left, after reviewing the entire record, "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), *reh'g denied* 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948). In making a decision as to whether a mistake has occurred, this court defers to the district court's determinations with respect to the credibility of witnesses. "Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them." *United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

█ In a recent case also involving racial motivation of public officials in withdrawing support for a low-income housing project, *Smith v. Town of Clarkton,* 682 F.2d 1055, 1064–1065 (1982), the Fourth Circuit wrote:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this. The trial court, in making findings of fact, was faced with the same problems confronting trial courts everywhere sitting as finders of fact in cases involving racial discrimination.

We conclude that the city's contentions that the findings of the district court are based upon hearsay testimony and are "clearly erroneous" are without merit.

## IV

█ The City also contends the district court erred by examining the motivation of voters who opposed the Baldwin House proposal in the nonbinding referendum held April 3, 1978. We do not read the opinion of the district court as dependent upon the motivation of voters in this referendum for its decision. The facts enumerated by the district judge in support of his conclusion that the City interfered with the Baldwin House plan were the following:

> We conclude that the City's interference with the Baldwin House plan to construct low-income family housing was, in part, racially motivated. Among the facts that lead us to this conclusion are the views expressed by a significant number of opponents of Baldwin House (uttered both on the public record and within the hearing of those who testified at trial); a Commission that knowingly pursued policies that appeased those who expressed these bigoted views; the opinion testimony of supporters of Baldwin House describing the motivation of their opposition; the unusual sequence of events leading to the contract amendments and the Commission's decision not to extend its contract with Baldwin House; the decision to conduct an advisory referendum on the Baldwin House proposal; the extreme hostility and persistence displayed by opponents of Baldwin House in their efforts to defeat its proposal; the defeat of three commissioners at the April 3, 1978 election and the subsequent recall of the remaining three commissioners who favored the Baldwin House proposal; and the fact that Birmingham was and still is a virtually all-white community despite its longstanding open-housing ordinance.

538 F.Supp. at 826.

Racial motivation of voters in the referendum is not articulated in this paragraph as one of the critical factors. The court stated the basic issue in the case to be

"whether the city's interference with the Baldwin House/MSHDA negotiations was racially motivated," 538 F.Supp. at 830; and, notwithstanding any racially discriminatory motives on the part of voters, the court found that numerous actions of city officials which restricted and finally terminated those negotiations were based on racially discriminatory considerations. This statement of the issue is not erroneous and the district court's findings on this issue are not clearly erroneous. We affirm the District Court's decision on this basis and on the basis of the seven factors enumerated in the above-quoted paragraph. We therefore do not find it necessary in this opinion to pass upon the issue of whether a district court may make a judicial examination of the motivation of voters in an advisory referendum election.

## V

We further conclude that the district court did not err in holding that the City acted with discriminatory intent in blocking the Baldwin House proposal. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) sets forth the standards against which official conduct may be weighed in attempting to determine whether that conduct was motivated by a discriminatory purpose. "[O]fficial action will not be held unconstitutional *solely* because it results in a racially disproportionate impact. 'Disproportionate impact is *not* irrelevant, but it is not the sole touchstone of invidious racial discrimination.'" 429 U.S. at 265, 97 S.Ct. at 563, *quoting Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). (emphasis added). The Court in *Arlington Heights* went on to say:

> *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because

legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

429 U.S. at 265–66, 97 S.Ct. at 563–564. (footnotes omitted).

To assist courts in this inquiry, the Supreme Court has identified objective factors that may be probative of racially discriminatory intent: (1) the racial impact of an official action; (2) the historical background of the decision; (3) the sequence of events leading up to the challenged decision, including departures from normal procedures and usual substantive norms; and (4) the legislative or administrative history of the decision. *Arlington Heights, supra,* 429 U.S. at 266–267, 97 S.Ct. at 563–564. No single factor may be dispositive of this decision. In the present case we conclude that the district court did not err in deciding that the totality of circumstances establishes that the City of Birmingham blocked development of Baldwin House with racially discriminatory intent. The details of evidence supporting this conclusion are set forth in the opinion of the district court. 538 F.Supp. 819 *et seq.*

## VI

The United States and the City of Birmingham have agreed, both in their brief and in oral argument, that the district court exceeded its remedial authority by enjoining the City from engaging in *"any conduct"* that interferes with Baldwin House's efforts to construct low-income family and senior citizen housing within the

City of Birmingham. The Government concedes that the injunction should be limited to prohibition of conduct *because of race.* The Government agrees that the City "should be left free to pursue legitimate interests, such as the enforcement of zoning ordinances and building codes, so long as their interests are not exercised with discriminatory motive."

We agree with the Government's concession. Accordingly, it is ORDERED that the first paragraph of the judgment of the district court reported at 538 F.Supp. 831, be and hereby is amended by inserting after the words "from engaging in any conduct" the words "because of race or with discriminatory motive on account of race."

■ The City further contends that the judgment of the district court is erroneous because "it is not limited to the nature of the violations found." For example, the City asserts the district court exceeded its authority by permitting Baldwin House to "obtain additional extensions" of the contract for sale of the Baldwin School site by petitioning the court. We hold this provision is not an abuse of discretion. After automatic extensions expire, the district court, on the application of Baldwin House, may examine the circumstances that have prevented the sale of the land and determine whether or not a further extension is proper. The injunction does not commit the district court to grant a further extension. It merely leaves the door open to insure that appropriate efforts can be expended to make whole the victims of the City's discriminatory conduct.

■ It is well established that flexibility is proper in the successful shaping and supervision of an equitable decree. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 *reh'g denied* 403 U.S. 912, 91 S.Ct. 2200, 29 L.Ed.2d 689 (1971); *United States v. City of Parma,* 661 F.2d 562, 563, 576 (6th Cir.1981).

With the exception of the modification of the injunction set forth above, the judgment of the district court is affirmed. No costs are taxed. The parties will bear their own costs in this court.