**BUCKEYE COMMUNITY HOPE FOUNDATION, et al., Plaintiffs,**

v.

**CITY OF CUYAHOGA FALLS, et al., Defendants.**

**No. 5:96CV1458.**

United States District Court, N.D. Ohio, Eastern Division.

July 5, 1996.

See also 82 Ohio St.3d 539, 697 N.E.2d 181.

Diane E. Citrino, Edward G. Kramer, Kramer & Associates, Cleveland, OH, for Plaintiffs.

Virgil E. Arrington, Jr., City of Cuyahoga Falls Department of Law, Cuyahoga Falls, OH, E. Marie Wheeler, Barberton, OH, Jack Morrison, Jr., Amer, Cunningham & Brennan, Steven W. Mastrantonio, Roderick Linton, William E. Schultz, Office of the Prosecuting Attorney, Akron, OH, Stephen E. DeFrank, Office of the Attorney General State of Ohio, Department of Development, Columbus, OH, for Defendants.

Roger Gupta, Unknown, Pro se.

Bruce L. Ingram, Vorys, Sater, Seymour & Pease, Columbus, OH, for Movant.

## MEMORANDUM OF OPINION AND ORDER

POLSTER, District Judge.

Before the Court are cross-motions for summary judgment (Doc. Nos. 143, 151). Plaintiffs (collectively, the "Developers") move for partial summary judgment on their substantive due process claims (Counts 2 and 4 of its First Amended Complaint). Defendants move for summary judgment on all claims, *i.e.*, the substantive due process claims, a Fair Housing Act claim (Count 1), and an equal protection claim (Count 3).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). All facts and inferences drawn therefrom must be viewed in a light most favorable to the nonmoving party. *See LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993). If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## I. FACTS

To recount briefly the salient facts of this case,[1] Buckeye Community Foundation ("Buckeye") is a nonprofit corporation that develops affordable housing by utilizing low income housing tax credits. The relationship between the plaintiffs has been previously established.[2] In June 1995, Buckeye expressed an interest in developing a low income housing project in the City of Cuyahoga Falls (the "City") to Mayor Don Robart who expressed no objection.

Buckeye thereafter bought the land and began working with the City Planning Director on development details. After the site plan was submitted to the City Planning Commission for review, it was approved subject to certain conditions. One of the conditions required the Developers

---

1. *See Buckeye Community Hope Found. v. City of Cuyahoga Falls*, 970 F.Supp. 1289, 1292–296 (N.D.Ohio 1997) (*"Buckeye (federal)"*) for a detailed account of the facts. Disputed facts will be construed in the plaintiffs' favor.

2. The parties dispute whether one of Buckeye's prospective contractors and its architect have standing to bring these federal claims. The Court finds that they do not. The relationship between the remaining plaintiffs is set forth at *Buckeye (federal)*, 970 F.Supp. at 1293, 1303–306.

to erect a fence on one side of the site before the building permit for the apartment complex could issue.

Pursuant to the Charter of Cuyahoga Falls (the "Charter"), the recommendation was presented to the City Council for approval.[3] The Mayor immediately expressed his opposition to the site plan to Council members. Despite his opposition, the site plan was approved—after three Council meetings—in the form of Ordinance No. 48–1996 (the "Ordinance") by a six-to-three vote of the City Council on April 1, 1996. Within days, the Developers applied for a building permit. A permit to build the fence was issued later that month; however, the fence was never built.[4]

Parallel to the site plan approval process, a referendum effort was building. The Charter provided that the citizens of Cuyahoga Falls had "the power to approve or reject at the polls *any ordinance* or resolution passed by the Council."[5] Several referendum meetings were held. The Mayor attended some of them and clearly supported the referendum effort.

On April 30, 1996, referendum petitions with the requisite number of signatures were submitted to the Clerk of City Council who, in turn, certified the petitions to the Summit County Board of Elections (the "Board of Elections"). The petitions requested a referendum to approve or reject the Ordinance approving the site plan. On May 1, 1996, the Board approved the referendum.

That same day, the Developers filed an action in state court to enjoin the referendum. They contended that the Ordinance could not be challenged by referendum because its passage by City Council was an administrative act, as opposed to a legislative act. The Developers argued that Section 1f, Article II of the Ohio Constitution did not grant to citizens referendum powers on administrative actions taken by municipal legislative bodies, and that Council approval of the site plan was an administrative act. Section 1f, Article II (the "referendum provision") provides,

> The initiative and referendum powers are hereby reserved to the people of each municipality on all questions which such municipalities may now or hereafter be authorized by law to control by legislative action; such powers may be exercised in the manner now or hereafter provided by law.

*Id.* That referendum provision is the sole constitutional source of referendum powers reserved to municipalities. On May 31, 1996, the Developers' motion for preliminary or permanent injunction was denied on the underlying merits.[6]

On June 20, 1996, the Developers once again requested issuance of a building permit. This request was denied by the City Engineer, who indicated by letter that he could not issue the permit in light of the pending referendum. The Court has previously affirmed this opinion, ruling that various Charter provisions operated as a freeze on the issuance of a building permit.[7]

On July 5, 1996, the Developers filed this case alleging that the defendants violated housing discrimination laws under the Fair Housing Act and the Equal Protection Clause of the United States Consti-

---

3. Charter, Article VIII, Section 1.

4. Council approval was not necessary to build the fence.

5. Charter, Article IX, Section 2 (emphasis added).

6. The parties agreed that the injunction hearing would be a trial "on the merits."

7. See *Buckeye (federal)*, 970 F.Supp. at 1307–308.

tution, and denied them substantive due process under the Fourteenth Amendment of the U.S. Constitution. The Developers' motion for a preliminary injunction was denied in November 1996. The voters elected, by referendum, to repeal the Ordinance approving the site plan.

Meanwhile, the decision of the state court that the referendum was authorized by the Ohio constitution was affirmed on appeal. On May 6, 1998, the Ohio Supreme Court also affirmed that decision, holding by a 4–3 margin that the referendum did *not* violate the referendum provision of the Ohio Constitution.[8] Two months later, however, upon reconsideration, one Justice changed his opinion and the Ohio Supreme Court reversed itself, holding that the referendum did indeed violate that provision.[9]

On June 20, 1997, the Court granted in part, and denied in part, preliminary summary judgment motions in this case.[10] The second set of summary judgment motions, currently pending, address the only issues that survived the first ruling. Those issues are: (1) whether the City violated substantive due process by certifying the referendum petition and/or refusing to deliver the building permit to the Developers, (2) whether the City violated the equal protection clause based on race, and (3) whether the City violated the Fair Housing Act based on discriminatory intent and/or disparate impact.[11]

· At the last status conference on July 26, 1999, the Developers advised the Court that they were proceeding to build the low income housing project.

## II. LAW AND ANALYSIS

As a preliminary matter, the Court notes that if the 1996 referendum were to take place *today*, it would clearly violate the referendum provision of the Ohio Constitution under the Ohio Supreme Court's most recent ruling. However, even a properly-authorized referendum can be found to be discriminatory or otherwise violate certain rights under the U.S. Constitution.

### A. *Substantive Due Process Claim*

Counts 2 and 4 raise the issue of substantive due process. Specifically, Count 2 alleges that the acts of the defendants Clerk of Council and City Engineer were "arbitrary, capricious and unreasonable acts which bear no relation to any legitimate or compelling state interest ..." Count 4 alleges that the City officials' acts constituted an unlawful delegation of the zoning power to the electorate. The Developers contend that the City Charter, as applied, operated to deny them due process of law when the City refused to issue them a building permit, after having fulfilled substantially all of the preliminary legal requirements for obtaining one. In

**8.** *Buckeye Community Hope Foundation v. City of Cuyahoga Falls,* 81 Ohio St.3d 559, 692 N.E.2d 997 (May 6, 1998) (*"Buckeye I"*).

**9.** *Buckeye Community Hope Foundation v. City of Cuyahoga Falls,* 82 Ohio St.3d 539, 697 N.E.2d 181 (Jul. 16, 1998) (*"Buckeye II"*). More specifically, the Ohio Supreme Court held that the City Charter provision permitting referenda on *all* ordinances enacted by the City Council was constitutionally invalid as applied to administrative acts. The City Charter could not bestow upon the citizens of Cuyahoga Falls greater powers than

those granted by Section 1f, Article II of the Ohio Constitution. The Court also found that Council could not designate an action as "legislative" simply because it so desired. Rather, it was the *nature* of the action that determined whether it is legislative or administrative. It concluded that the Ordinance at issue merely formalized an administrative act. *Id.*

**10.** The Court's ruling is reported at *Buckeye (federal),* 970 F.Supp. 1289.

**11.** *Id.*

other words, the Charter deprived them of their entitlement to the permit in an arbitrary and capricious manner.

▮▮▮ In order to sustain a substantive due process claim, the Developers must first show that they had a "legitimate claim of entitlement" to the building permit, or a "justifiable expectation" that they would not be dispossessed of that right. *Silver v. Franklin Township Board of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir.1992). Once established, the Developers must then show that the governmental action denying that right or entitlement was arbitrary or capricious, *i.e.*, that there was no rational basis for the denial. *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir.1992).

▮▮ The Court need not address the preliminary issue of entitlement because the Developers cannot show that any act of a City official or the electorate was arbitrary or capricious, or that the City's failure to issue them a building permit in 1996 was irrational.[12] The undisputed evidence shows that City Council approved the site plan. The approval of the plan was formalized, as was customary, by ordinance. The Charter permitted referenda on 'all ordinances ... passed by the Council.' All parties agree that the citizens of Cuyahoga Falls submitted facially neutral referendum petitions with the requisite number of signatures to the Clerk of City Council. Pursuant to the Charter, the Clerk certi-

fied the petitions and submitted them to the Board of Elections. The Board of Elections approved the referendum and put the Ordinance to a vote. The Ordinance approving the site plan was thereafter repealed. Until July 1998, the propriety of the referendum was confirmed by three state courts, including the Ohio Supreme Court.

Additionally, the City was legally prohibited from issuing a permit to the Developers pending the outcome of the referendum. The referendum passed, repealing the Ordinance that approved the site plan. Thus, there was no time (until the Supreme Court reversed itself in July 1998) during which the City had any legal authority to issue a permit to the Developers.

The evidence shows that the City did issue a permit to the Developers to build a fence. Construction of the fence was a precondition to obtaining a permit to build the apartment complex, but the fence was never built.[13] Hence, at least one of the conditions for receiving a building permit was never fulfilled. The Court finds that all actions undertaken by the City (and the electorate) have a rational basis in the law.

The Developers allege that it was arbitrary and capricious for the Clerk to certify the petitions to the Board of Elections. In Cuyahoga Falls, when a referendum petition is filed, the Clerk of City Council is required by Charter to submit the same to the Board of Elections.[14] The petitions

---

**12.** The Court is not convinced that the Developers have established that they had a *due process entitlement* to the building permit simply because Council approved their site plan. Council's approval of the plan was not only discretionary, but *conditional*. It depended on the fulfillment of numerous conditions, one of which was the building of a fence. Although the Developers have successfully argued (for ripeness purposes) that it would have been fruitless to build a fence under the circumstances, the fact is the fence was never built. Without satisfying all conditions, the

Developers are hard-pressed to argue that they were constitutionally entitled to a building permit.

**13.** The Court previously ruled (for ripeness purposes) that the building of a fence would have been futile, *i.e.*, an unnecessary prerequisite to filing this lawsuit. This finding, however, does not change the fact, for due process entitlement purposes, that the fence was never built.

**14.** Charter, Article IX, Section 2.

were facially neutral and they contained the requisite number of signatures. Under the circumstances, it would have been remiss for the Clerk to withhold the petitions from the Board.

Furthermore, it was not *evident* to anyone' in 1996—let alone the Clerk—that such referenda violated the Ohio Constitution. The City Charter expressly permitted such referenda and there was no reason for the Clerk to think otherwise. Three courts reinforced this assumption— including the Ohio Supreme Court. The fact that the highest state court issued contradictory 4–3 rulings on this issue in less than three months shows just how close this question of state law was. Surely, the Cuyahoga Falls Clerk (or any other City official) cannot be charged with any greater knowledge of the law than the state courts of Ohio.

The Developers also allege that the City Engineer's decision to deny issuance of the permit was arbitrary and capricious. The Court has already ruled that the City was without authority to issue the building permit.[15] Moreover, the Engineer sought advice from the Law Director before refusing to issue the permit. The Engineer simply relayed the information the Law Director gave to him to the Developers. The Court finds that the City Engineer's refusal to issue the permit pursuant to the Charter and the advice of counsel was neither arbitrary nor capricious.

Judge Bell previously found that the evidence did not support the Developers' assertions that the Mayor organized the petition drive, secured meeting places for the citizen group opposed to the project, certified the petition, or submitted the referendum question to the Board of Elections.[16] Plaintiffs have provided no additional evidence otherwise.[17] Even if plaintiffs could establish that the Mayor was the force behind the referendum, however, there is no evidence that the Mayor had any legal authority to issue a permit.

The Developers ultimately rest on the purely legal argument that, because the referendum was unauthorized under state law, there was no rational legal basis for the acts of City officials in refusing to issue a building permit.[18] In other words, because Council's approval of the site plan could not be put to popular vote, the Developers were *entitled to a building permit.* The Court disagrees. The Developers were not entitled to a permit to build the apartment complex until they satisfied all the requisite conditions. Granted, the referendum frustrated the Developers' incentive to fulfill those conditions, but there is no factual dispute that all conditions were not met.

The Ohio Supreme Court's after-the-fact decision that the 1996 referendum was not authorized under the *Ohio* Constitution does not automatically turn the acts of the electorate, the Clerk, the City Engineer, or the Mayor into violations of substantive due process under the *United States* Constitution. Such claims require irrational conduct, and the Developers have failed to establish a factual issue regarding the reasonableness of the City's actions—notwithstanding the opinion of an expert to the contrary.

15. *See Buckeye (federal),* 970 F.Supp. at 1307–308.

16. *Id.,* 970 F.Supp. at 1321.

17. Plaintiffs allege that the Mayor *may* have made a City building available for a referendum meeting. This unsupported allegation is insufficient to make this due process claim survive summary judgment.

18. See Plaintiffs' Motion for Partial Summary Judgment, Doc. No. 143.

Based on the undisputed evidence, the Court finds that it was neither arbitrary nor capricious for the electorate to bring the referendum, for the City to certify the petitions to the Board of Elections, or for the City to refuse to issue the building permit. Thus, the Court dismisses the substantive due process claims as a matter of law. If the defendants' conduct in this case is to be found actionable at all, it must be shown to be discriminatory.

## B. *Equal Protection Claim—Intentional Discrimination*

Plaintiffs claim that defendants violated the Equal Protection Clause of the United States Constitution on the basis of race. The United States Supreme Court articulated the prerequisites for bringing such a claim:

> [O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.' Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection clause.

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) *citing Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). All parties agree that a showing of discriminatory intent on the part of *City officials* is necessary for the Plaintiffs to prevail on their equal protection claim. The only officials whose actions are at question here are those of the Mayor, the Clerk of City Council, and the City Engineer.

The Sixth Circuit has held that the following four factors are probative of racially discriminatory intent:

(1) the racial impact of an official action;

(2) the historical background of the decision;

(3) the sequence of events leading up to the challenged decision, including departures from normal procedures and substantive norms; and

(4) the legislative or administrative history of the decision.

*United States v. City of Birmingham, Mich.*, 727 F.2d 560, 565 (6th Cir.1984).

 Importantly, a district court cannot inquire into the electorate's motivations in an equal protection clause context "absent a referendum which discriminates facially, or one where although facially neutral, *the only possible rationale is racially motivated.*" *Arthur v. City of Toledo*, 782 F.2d 565, 573 (6th Cir.1986) (emphasis added).[19] Policy considerations limit a court's examination of the factors motivating the electorate in a referendum election, *e.g.*, the difficulty of ascertaining the electorate's motivations and the fact that "the bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." *Clarke v. City of Cincinnati*, 40 F.3d 807, 815 (6th Cir.1994) (citations omitted).

 All parties agree that the referendum at issue was facially neutral. The Court now finds that racial discrimination, if present, was not the only possible explanation for the 1996 referendum. It is quite possible that the citizens of Cuyahoga Falls may have demanded the refer-

---

**19.** *See also Equality Foundation of Greater Cincinnati v. City of Cincinnati*, 128 F.3d 289, 293 (6th Cir.1997) (in reviewing district court decisions, "[the Sixth Circuit] may not even inquire into the electorate's possible actual motivations for adopting a measure via initiative or referendum. Instead, the court must consider all hypothetical justifications which potentially support the enactment.").

endum for, *inter alia,* safety or economic reasons. This is in fact borne out by the testimony of referendum proponents.

One supporter was concerned about the location of the development. He testified that access to the site was inadequate and that fire trucks might not be able to get in to the development in the winter.[20] Another argued that a newly-opened school did not have enough capacity for the anticipated number of new students the development would bring.[21] A third supporter, noting that he had just paid an additional $300/year in real estate taxes for a recently-passed levy, testified that he could not afford another levy to alleviate the impact on the school system.[22] Because there are rationales other than racial discrimination that may have (and did in fact) motivate the voters, the Court may not 'inquire into' the entire electorate's motivations in petitioning for the referendum. *Arthur,* 782 F.2d at 573.

■ The issue, then, is whether city officials intended to discriminate on the basis of race by submitting the referendum petitions to the Board of Elections, or by withholding the building permit from Buckeye. The Court finds that plaintiffs have provided absolutely no evidence that the Clerk or City Engineer had any racial animus in carrying out their ministerial functions. Thus, the Court will focus solely on the conduct of the Mayor.

■ The undisputed evidence shows that Mayor Robart opposed the site plan and voted against it at the City Council meeting. Plaintiffs contend that the May-

or's support of the referendum was motivated by racial discrimination—citing a statement he made at the March 18, 1996 City Council meeting:

> [T]he issue is low income housing . . . That is the whole issue here. Density is not an issue here.[23]

At the March 4, 1996 Council meeting, the Mayor talked about an article called "Stuck in the Ghetto" and discussed the effect of busing on Cleveland's schools.[24] He discussed how Cuyahoga Falls had "done [their] part off Graham Road," referring to the only Cuyahoga Falls development with a substantial number of African Americans.[25]

The Court is aware of no law that prohibits the Mayor from expressing his opinion in Council meetings, or requires him to cast his Council vote a certain way. Obviously, the Mayor's opinion did not hold much weight with Council because the plan was approved despite his opposition. The Court finds that the Mayor's isolated, obscure comments made within the context of a Council meeting are insufficient as a matter of law to show racial animus, and had no bearing *in fact* on Council's approval of the site plan.

■ The undisputed evidence also shows that the Mayor supported the referendum effort. However, there is no law prohibiting the Mayor from supporting the referendum, and the plaintiffs have provided no evidence that he made discriminatory comments at any referendum support meetings. Indeed, a Fair Housing Advocacy "tester" sent to one of the meetings to detect discrimination testified that Robart made no discriminatory comments at all.[26]

**20.** William Suren Deposition, p. 33.

**21.** Frank Pribonic Deposition, pp. 54–55.

**22.** Lee Minier Deposition, p. 26.

**23.** Minutes of March 18, 1996 Cuyahoga Falls City Council Meeting.

**24.** See Reply of Plaintiffs to Defendants' Motion for Summary Judgment, pp 3–4.

**25.** *Id.*

**26.** November 19, 1996 Hearing Transcript ("Tr."), p. 300.

■ Assuming the Mayor did have a racial animus, there is no evidence that he was responsible for certifying the petitions or denying the building permit. The undisputed evidence shows that the Clerk submitted the petitions to the Board of Elections, and the City Engineer denied issuance of a building permit. There is no evidence that the Mayor had any authority to carry out these administrative tasks or that he had a hand in facilitating them.

In short, the undisputed facts show that City Council approved the site plan over the Mayor's opposition, that the Clerk properly submitted the referendum petition to the Board of Elections, and that the City properly refused to issue the building permit to Buckeye.[27] Because the Developers have failed to raise a material factual question on the issue of intentional racial discrimination, the equal protection is dismissed as a matter of law.

## C. *Fair Housing Act*

■ Under 42 U.S.C. § 3604(a), it is unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." *Id.* This section applies to municipalities. *United States v. City of Parma, Ohio*, 661 F.2d 562 (6th Cir.1981). Plaintiffs argue that the City intentionally discriminated against families and racial minorities, and that the referendum was discriminatory because it had a disparate

impact on racial minorities and families with children.

### i. *Intent to Discriminate*

■ There is no distinction between the elements of a housing discrimination claim, based on discriminatory *intent*, under the Equal Protection Clause or the Fair Housing Act. *See, e.g., Village of Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. at 563. The Court finds that the plaintiffs have provided no evidence that City officials discriminated against *families* by submitting the petition to the Board of Elections or denying the permit. For this reason and the reasons set forth with respect to intentional racial discrimination under the equal protection claim, *supra*, pp. 727–28, the Court finds that the Developers have failed to raise a material factual issue with respect to intentional discrimination under the Fair Housing Act.

### ii. *Disparate Impact*

■ Under limited circumstances, a violation of the Fair Housing Act can be established by showing discriminatory impact without a showing of discriminatory intent. *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977). The Court must consider three factors:

(1) the strength of the plaintiff's showing of discriminatory effect;

---

**27.** These facts are completely distinguishable from *United States v. City of Birmingham*, 538 F.Supp. 819 (E.D.Mich.1982), *aff'd* 727 F.2d 560 (6th Cir.1984) wherein the City of Birmingham took active steps to subvert a similar project, such as putting contractual roadblocks in the way of Council approval, holding a **voluntary** referendum requested by voters who were clearly opposed to the project for racial reasons, and then honoring the

inevitable outcome. Here, City Council approved the site plan by ordinance, which the Mayor did not veto. The City of Cuyahoga Falls later honored a mandatory referendum permitted under City Charter. (Although *Birmingham* involved a discrimination claim brought under the Fair Housing Act, the standards for proving intentional discrimination under that Act and the Equal Protection Clause are the same.)

(2) the defendant's interest in taking the action complained of; and

(3) the plaintiff's goal, *i.e.*, whether it is to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Arthur v. Toledo*, 782 F.2d 565, 575 (6th Cir.1986).

■■■ The third factor requires the Court to examine the goals of the plaintiffs in bringing this case. The Court will not question the motives of the Developers in litigating this action. Their perseverance in vindicating their rights under Ohio law can only be commended.

The first factor requires the Court to assess the discriminatory effect of the referendum. There is no doubt that the repeal of the Ordinance approving development of a low income housing site had a disparate effect on racial minorities and families with small children. The mission of the Buckeye Community Foundation is to provide affordable housing to persons in low income brackets. Racial minorities and families with small children constitute a significant portion of that bracket. If this fact alone was sufficient to prove a disparate impact claim, however, every denial of a permit to construct low income housing would necessarily violate the Fair Housing Act.

Regarding the second factor, the importance of the referendum as a means of democratic process is beyond question.

The reservation of such power is the basis for the town meeting, a tradition which continues to this day in some States as both a practical and symbolic part of our democratic processes. The referendum, similarly, is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.'

*Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 672–73, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) (citations omitted). Given the strong policy considerations underlying referenda, the Sixth Circuit has held that the discriminatory effect of a referendum cannot establish a violation of the Fair Housing Act "absent highly unusual circumstances." *Arthur*, 782 F.2d at 575.

The Court has ruled that submission of the referendum petition to the Board of Elections and denial of the building permit were ministerial acts that were mandated by law. The Developers have failed to establish a material factual issue regarding the discriminatory intent of the City officials. Although plaintiffs have provided evidence that supporters of the referendum made discriminatory comments at organizational meetings, the undisputed evidence shows that over 20,000 people voted on the referendum. Again, the bigoted comments of a few voters cannot be imputed to the entire electorate or to the City. *Arthur*, 782 F.2d at 573–74 (citations omitted). The Court finds that the Developers have failed to establish the presence of highly unusual circumstances.

Given the disparate effect of the referendum and the good intentions of the Developers in pursuing their legal rights, it is the utter failure of plaintiffs to establish highly unusual circumstances on the part of the City that requires dismissal of the disparate impact claim under the Fair Housing Act.

### III. CONCLUSION

Today, it is clear that City Council's approval of the plaintiffs' proposed site plan could not be put to popular vote under the Ohio Constitution, and that plain-

tiffs' project should have gone forward in 1996. However, plaintiffs have failed to show that the defendants' conduct violated any of the federal claims alleged. Accordingly, summary judgment is granted in defendants' favor on all counts of the complaint.

**IT IS SO ORDERED.**

### *JUDGMENT ENTRY*

For the reasons stated in the Memorandum of Opinion and Order filed contemporaneously with this Judgment Entry, and pursuant to Federal Rule of Civil Procedure 58, it is hereby ORDERED, ADJUDGED AND DECREED that the above-captioned case is **hereby terminated and dismissed as final.**

**IT IS SO ORDERED.**