**JIM SOWELL CONSTRUCTION CO., INC., et al., Plaintiffs,**

v.

**THE CITY OF COPPELL, TEXAS, Defendant.**

**No. Civ.A. 3:96–CV–0666–D.**

United States District Court, N.D. Texas, Dallas Division.

Aug. 19, 1999.

Stuart M. Reynolds, Jerry Hicks(argued), Steven A. Siegel, Winstead, Sechrest & Minick, P.C., Dallas, TX, for Plaintiffs.

Darrel G.M. Noga (argued), William F. Allred, Kevin E. Oliver(argued), Matthew R. Scott, Cooper & Scully, P.C., Dallas, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

The dispositive question presented by the motion for summary judgment of defendant City of Coppell, Texas (the "City") is whether there is a genuine issue of fact that the City intentionally discriminated based on race, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, when it made the land use and zoning

decisions at issue. Concluding that there is, the court denies the motion.

## I

The pertinent background facts are set out in prior memorandum opinions and orders of the court and need not be repeated at length. *See, e.g., Jim Sowell Constr. Co. v. City of Coppell,* Civil Action No. 3:96–CV–666–D, slip op. at 1–3 (N.D.Tex. Oct. 15, 1997) (Fitzwater, J.). Plaintiffs sue the City, alleging that it violated the FHA by (1) downzoning plaintiffs' property from multifamily to single family use; (2) adopting amendments to the multifamily zoning regulations that limited multifamily units to two stories and required 60–foot setbacks; and (3) denying a building permit to construct a three-story multifamily project. Plaintiffs assert that the City undertook this conduct as part of a strategy to prevent the development of low income housing in Coppell for the purpose of excluding racial minorities from residing there.

The City moves for summary judgment, contending that plaintiffs cannot prove their FHA claim because they cannot establish that the City acted with discriminatory intent or that the City's actions disproportionately impacted non-whites or other persons with FHA rights. For the reasons that follow, the court holds that plaintiffs have presented a genuine issue of material fact that precludes summary judgment on the question of discriminatory intent. The court does not reach the question of discriminatory impact.

## II

Section 804(a) of the FHA, 42 U.S.C. § 3604(a), makes it unlawful to "make unavailable or deny, a dwelling to any person because of race." "Courts have consistently given an expansive interpretation to the Fair Housing Act; to state a claim under the Act, it is enough to show that race was a consideration and played some role in a real estate transaction." *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir.

1986) (citing *Moore v. Townsend,* 525 F.2d 482 (7th Cir.1975)).

## III

The City moves for summary judgment concerning the discriminatory intent or treatment means of proving an FHA claim. It posits that the record is devoid of evidence that would permit a reasonable jury to conclude that the City intended to discriminate against minorities. The City asserts that the record lacks evidence that demonstrates that it knew that the apartments in question were intended to house minorities or other persons with FHA rights.

### A

■ The burden-shifting method of proof typically used in employment discrimination cases generally applies to claims asserted under the FHA. *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1556 (5th Cir.1996) (concluding that Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.,* model was appropriately applied to FHA case in which question was whether plaintiff presented sufficient evidence for jury to make reasonable inference that race motivated bank's rejection of refinancing proposal in predominantly minority area). Under this framework, the City bears the burden of producing legitimate, nondiscriminatory reasons for the land use and zoning decisions at issue. *See Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 992–93 (5th Cir. 1996) (en banc).

### B

■ In attempting to satisfy this burden, the City only asserts that the court has already held in its October 15, 1997 memorandum opinion and order that the City had the necessary legitimate, nondiscriminatory reasons. *See* D. Br. at 12–13. The City's reliance on this holding, however, is misplaced. The section of the opinion to which the City refers analyzed plain-

tiffs' federal Takings Clause claim. *See* Oct. 15, 1997 Op. at 6–8. As the court noted, "[a] land use regulation constitutes a taking where the regulation does not substantially advance legitimate state interests or denies an owner economically viable use of his land." *Id.* at 6 (citing *Texas Manufactured Hous. Ass'n v. Nederland*, 101 F.3d 1095, 1104–05 n. 11 (5th Cir.1996)). Because the court held that the City's zoning decisions did not deny plaintiffs economically feasible use of their land, the court was necessarily required to address whether those decisions substantially advanced legitimate state interests. *See id.* at 6–7. After noting that the City had "advanced several reasons for the zoning change from multifamily dwellings to single family dwellings," the court held that "the rezoning substantially advanced these state interests." *Id.* at 8. Contrary to the City's position, the court did not hold, nor was it required to determine, that the reasons the City advanced were legitimate and nondiscriminatory. *See id.* at 8 (stating that the City "advanced *several reasons*") (emphasis added). The City fails to argue, nor could it reasonably assert, that this holding concerning the Takings Clause applies equally to plaintiffs' FHA claim. Because the City has failed to satisfy its burden of producing legitimate, nondiscriminatory reasons for the zoning and land use decisions in question, the court must deny the City's motion for summary judgment based on discriminatory intent.

## IV

■ Assuming *arguendo* that the City had produced legitimate, nondiscriminatory reasons, summary judgment must still be denied.

### A

■ Had the City met its production obligation, the burden would shift to plaintiffs to show that the City acted with discriminatory intent. *See Rhodes*, 75 F.3d at 993. To satisfy this burden, plaintiffs must present evidence that would allow a rational factfinder to make a reasonable inference that race was a determinative reason for the housing decision. *Simms*, 83 F.3d at 1556. Plaintiffs can avoid summary judgment if the evidence taken as a whole creates a fact issue as to whether each of the City's stated reasons for the conduct in question was what actually motivated the City, and creates a reasonable inference that race was a significant factor in the land use and zoning actions. *Id.* It is not enough merely to show that the reason given by the City is not the real reason. *See id.* Plaintiffs must also establish that the protected trait (in this case, race) was a significant factor, *id.*, although it need "only be 'one significant factor' in the challenged decision to violate the FHA," *id.* at 1556 n. 30 (citing *Woods–Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir.1982)). In sum, plaintiffs must show that "race was a consideration and played some role in [the challenged decision]." *Id.* (quoting *Hanson*, 800 F.2d at 1386).

A discriminatory purpose, as a motivating factor, implies that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

■ Because direct evidence of discriminatory purpose is rarely available, courts must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The court must therefore look at the totality of the relevant evidence to determine whether invidious discriminatory purpose was a motivating factor for the decision. *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In making this determination, the court is guided by a non-exhaustive list of factors, including (1) the discriminatory effect of the official action, (2) the historical

background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) departures from the normal procedural sequence, (5) departures from the normal substantive factors, and (6) the legislative or administrative history of the decision. *Arlington Heights,* 429 U.S. at 266–268, 97 S.Ct. 555.

## B

### 1

■ Plaintiffs may demonstrate that race was a significant factor in the City's actions by presenting circumstantial evidence regarding the impact of its official actions. *Id.* at 266, 97 S.Ct. 555. Under this factor, plaintiffs must show that the City's decisions bear "more heavily on one race than another." *Id.* (quoting *Washington,* 426 U.S. at 242, 96 S.Ct. 2040). Such evidence usually "involves statistical data supporting either a finding of perpetuation of segregation or of disproportionate impact." *Thornton v. City of Allegan,* 863 F.Supp. 504, 509 (W.D.Mich.1993).

Evidence from a designated expert indicates that 54% of African–American households, compared to only 25% of Caucasian households, live in multifamily housing located in Dallas County suburbs.[1] Ps.App. at 8. Stated another way, this evidence demonstrates that African–American families are much more likely to reside in apartment complexes than are Caucasian families. *Id.* at 8–9. By rezoning certain tracts of land from multifamily to single family use, and by reducing the maximum allowable height of multifamily buildings

from three to two stories, the City decreased the number of apartment units available to new residents. Because African–Americans are more likely to reside in such housing, this reduction in multifamily units had a statistically greater impact on African–American families than on Caucasian families.[2]

### 2

Another factor that may indicate that the City acted with discriminatory purpose is the historical background of the City's decisions. *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555.

■ Evidence relevant to this factor is the City's response to prior similar proposals, *see id; Thornton,* 863 F.Supp. at 509, or whether the City has historically discriminated against the protected group, *see Rogers v. Lodge,* 458 U.S. 613, 625, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (holding that "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized ... and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo."); *Harkless v. Sweeny Indep. Sch. Dist.,* 554 F.2d 1353, 1357 (5th Cir. 1977). Plaintiffs have not presented any evidence regarding the historical background of the City's zoning decisions. Instead, their evidence details only the specific events leading to the City's decisions to rezone certain land and to reduce the

---

1. In separate sections of its briefs, the City asserts that plaintiffs must present evidence of absolute numbers to demonstrate that the City's land use and zoning decisions had a significant discriminatory effect. D. Br. at 6; D. Rep. Br. at 2–5. The City has not argued, however, that this evidentiary requirement applies to the first *Arlington Heights* factor. Neither do its arguments demonstrate why this heightened requirement applies to the indirect factors used under the *Arlington Heights* framework. The court will therefore consider plaintiffs' statistical evidence under this factor.

2. The court is addressing this impact issue in the context of discriminatory intent, and suggests no view concerning whether absolute or proportional statistical analysis should be used in assessing disparate impact. *See supra* note 1. Moreover, this part of the court's opinion is a component of an alternative holding and is subject to further analysis in the context of plaintiffs' disparate impact claim, which the court does not reach today. *See infra* § V.

height limitation on multifamily housing. Because these actions are more properly analyzed under the third *Arlington Heights* factor, the court holds that plaintiffs have failed to demonstrate how the historical background of the City's zoning decisions supports a finding that race was a consideration in the actions at issue in this lawsuit.

### 3

The next *Arlington Heights* factor is the specific sequence of events leading up to the challenged decision. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555.

Plaintiffs contend that the City's reaction to applications for building multifamily complexes demonstrates that race was a significant factor in the City's actions. On November 17, 1993 CED Construction Inc. ("CED") filed a subdivision application seeking preliminary plat approval to build 280 multifamily units. Ps.App. at 164. The day after CED filed this application, the Planning and Zoning Commission (the "Commission") recommended placing a two-story limitation on multifamily housing projects. *Id.* at 165; Ps. Supp.App. Ex. 35 at 1, 8. Westwood Residential Company ("Westwood") later filed a building permit application for a multifamily subdivision consisting of 264 units. Ps.App. at 166. On March 8, 1994, six days after Westwood submitted its application, the City amended its zoning ordinance, reducing the maximum permissible height for multifamily units from three to two-stories. Ps. Supp.App. at 219, 221. Although this evidence does not compel the conclusion that the City acted with racial animus, a reasonable jury could take these actions into account in finding that race was a consideration in the City's zoning and land use decisions. *See United States v. City of Birmingham, Mich.*, 727 F.2d 560, 562–63 (6th Cir.1984)(holding that opposition that surfaced soon after people learned that developers wanted to build low income or minority housing was sufficient); *Creek v. Village of Westhaven*, 1995 WL 31587, at

*9, *10 (N.D.Ill. Jan. 26, 1995)(factor satisfied when municipality acted quickly after it learned that developer wanted to build homes for black families), *rev'd on other grounds*, 80 F.3d 186 (7th Cir.1996).

### 4

Evidence that the City departed from the procedural sequence it normally employs when making zoning decisions may also indicate that race was a significant factor in the City's decisions. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555.

Plaintiffs' most probative evidence in this context concerns the manner in which the Commission updated the City's Comprehensive Plan. The Commission began its efforts to amend the Comprehensive Plan in early 1992. *See* Ps. Supp.App. at 80. At that time, the Commission planned to finish its changes by October 15, 1992. *See id.* at 81. But contrary to its original deadline, the Commission continued to revise the Comprehensive Plan well after the target date. *See, e.g.,* Ps. Supp.App. Ex. 35 (minutes of November 18, 1993 meeting of Commission held to consider *inter alia* changes to Comprehensive Plan). The extension of the Commission's work on amending the Comprehensive Plan coincided with a general increase in the multifamily housing construction market. *See id.* at 88 (testimony that the City's multifamily housing market began to open up around 1993). The Commission's departure from the intended procedure permitted the Commission to adopt changes to the Comprehensive Plan that would affect the construction of multifamily units during this market boom. For example, the Commission in 1993 and 1994 continued to examine downzoning several tracts of land from multifamily to single family use. *See id.* at 95, 99–102, 104–07. These zoning decisions, which, as noted, arguably disproportionately impacted African–Americans, could not have occurred had the Commission ended its redrafting efforts in late 1992 as originally planned. This procedural deviation—if unexplained—could sup-

port a finding that race was a consideration in the City's zoning and land use decisions.

■ Plaintiffs rely on other evidence, however, that does not indicate that the City departed from the normal procedures. Plaintiffs contend that the Commission deviated from established procedures by failing to conduct any studies before it recommended a two-story maximum height limitation on multifamily units. They rely on Commission meeting minutes to show that no studies were ever conducted. These minutes detail the members' discussions concerning the recommendation to adopt the height limitation. *See* Ps.App. at 165. Although the minutes summarize the members' statements regarding this recommendation, they do not mention whether the Commission had previously conducted a study. *See id.* The minutes could have failed to mention a prior study because the members did not discuss it during the meeting, or because the secretary decided not to note any such discussion. Plaintiffs have failed to show by this evidence that the Commission did not conduct a study before recommending the height limitation. Moreover, plaintiffs have not produced any evidence that indicates that it is customary for a zoning commission to conduct a formal study before proposing a limit on the maximum height of multifamily housing complexes. Absent such evidence, they cannot demonstrate that the Commission departed from procedural norms even if it had not conducted a study before making its recommendation concerning the maximum allowable height of apartment complexes.

■ Plaintiffs also maintain that the City deviated from procedural norms when it adopted the height limitation for multifamily units only six days after it received Westwood's application to construct three-story apartment buildings. *See* Ps.App. at 166 (March 2, 1994 application); Ps. Supp. App. at 219, 221 (March 8, 1994 adoption of limitation). They have not introduced evidence, however, that this vote was in any way prompted by the City's receipt of the Westwood application. According to plaintiffs' evidence, the Commission had been considering this zoning change for roughly four months before the City received Westwood's application. *See* Ps. Supp. App. Ex. 35 at 1, 8 (November 18, 1993 recommendation to adopt limitation). There is no indication in the record that the City rushed to make a decision because of Westwood's application. Nor is there evidence that the City regularly tables zoning amendments that would adversely affect a recently-received building application. Without further evidence, the mere fact that the City adopted the height limitation on multifamily housing six days after receiving an application to construct three-story apartments would not permit a reasonable trier of fact to find that the City deviated from procedural norms.

■ Plaintiffs finally maintain that a procedural departure occurred when the City directed the Commission to complete its task and recommend revisions to the Comprehensive Plan within 90 days. *See* Ps.App. at 171. Plaintiffs contend that the City imposed this framework to prevent developers from obtaining permits within the current zoning parameters. Plaintiffs have not adduced any evidence, however, that the City did not normally impose deadlines on the Commission. Without such evidence, they have failed to demonstrate that the City disregarded established procedural guidelines when it imposed the 90–day deadline.

The court holds that plaintiffs have asserted, without sufficient supporting evidence, that the City engaged in several procedural departures. They have sufficiently demonstrated, however, that the Commission deviated from its normal procedure when it continued to amend the Comprehensive Plan beyond 1992. On the basis of this evidence, the fourth *Arlington Heights* factor indicates that race played a significant role in the City's zoning decisions.

### 5

Another indication that race was a consideration in a city's zoning actions is the city's departure from the substantive factors that are typically considered when the city adopts zoning changes. *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555.

Plaintiffs focus all of their supporting arguments on alleged procedural deviations of the City and the Commission. They have not enumerated the substantive factors that these bodies normally consider when making zoning and land use decisions, nor have they asserted that these bodies either ignored any of these factors or considered factors that are not usually employed. Plaintiffs have not presented a genuine issue of fact whether the City or the Commission departed from the normal substantive factors when it made the decisions at issue.

### 6

The legislative or administrative history of the disputed zoning decisions may indicate that race played a significant role in a city's actions. *Arlington Heights,* 429 U.S. at 268, 97 S.Ct. 555.

Statements made by members of the decisionmaking governmental bodies are most pertinent to this factor. *Id.* These members typically are not so bold or foolish, however, to announce publicly their intent to discriminate against a certain race. *Contreras v. City of Chicago,* 119 F.3d 1286, 1294 (7th Cir.1997). Absent direct proof, plaintiffs routinely are required to rely on circumstantial evidence to prove that a defendant was motivated by race when it made a housing decision. Because such indirect evidence requires an inferential step to find that a governmental body was motivated by race, the court must carefully consider any circumstantial evidence presented to support a finding of discriminatory motive.

██ Plaintiffs first direct the court to several comments that the City's Mayor

made concerning public housing. When discussing a consent decree that was entered in an attempt to integrate Dallas County suburbs, the Mayor stated that the City would "agree to 'sign off' on providing 404 low-income units and then say they will be built whenever land that is zoned multi-family becomes available.'" Ps.App. at 270. Due to the zoning regulations that encouraged single family development over multifamily construction, the Mayor concluded that such multifamily land "'will never become available.'" *Id.* This approach allowed the City to appear to act in harmony with the consent decree without resulting in an increase in its minority population. Plaintiffs also point to another comment that the Mayor made in connection with the possible sale of an apartment complex to the Dallas Housing Authority ("DHA"). After the DHA announced its intention to purchase the property, the Mayor stated, "'We have very, very tight restrictions on apartments and how they are maintained.... We are concerned that the buyer of the RTC property might not share that concern."' Ps. Supp.App. at 131. Plaintiffs' sole evidence for proving that the Mayor made these comments is two newspaper articles that purport to quote the Mayor. *See* Ps.App. at 270; Ps. Supp.App. at 131. These statements, which were introduced to demonstrate the City's plans for keeping out low income housing, are obviously hearsay. *See* Fed. R.Evid. 801(c); *Barnes Found. v. Township of Lower Merion,* 982 F.Supp. 970, 996 (E.D.Pa.1997).[3] This inadmissible evidence, *see* Fed.R.Evid. 802, cannot support a finding that race was a significant factor in the City's decisions.

Plaintiffs also assert that Gary Sieb ("Sieb"), a member of the Commission, made two statements that indicate that the City was motivated by race. When discussing the influx of new residents into the City, "Sieb explained that the new residents will most likely reflect the socioeconomic pattern of the residents that have

---

**3.** The City properly objected to this hearsay in    its briefing.

already moved into Coppell." Ps. Supp. App. at 77. Sieb then stated that " '[h]opefully the people that will be moving in will reflect what we have here already[.]' " *Id.* Three years later, when Sieb again was addressing the City's population increase, he stated, " 'A community like this just doesn't happen.' " *Id.* at 271. Again, plaintiffs' evidence for these statements is composed of quotations contained in two newspaper articles. *See id.* at 77, 271. This evidence is inadmissible hearsay. *See* Fed.R.Evid. 801(c), 802; *Barnes Found.*, 982 F.Supp. at 996. Absent admissible evidence, Sieb's comments cannot demonstrate that race played a significant role in the City's decisions.[4]

Sowell finally points the court to several statements that Coppell residents made concerning multifamily housing complexes. During public hearings, several citizens expressed views that could be construed as racially biased. At a public Commission hearing, citizens stated that " 'bringing in subsidized housing is going to bring the criminal element in [and will] bring in the crime right with it' " and that " 'we're damned scared about some of the social fears' of apartment development." Ps. App at 192. One month later, the City Council held an open meeting and permitted citizens to voice their opinions about multifamily complexes. During this meeting, one resident remarked, "I am against multi-families, and if that makes me prejudice[d], then yes, I am. I do not want to see multi-family housing in Coppell." Ps. Supp.App. at 161. Another member of the public noted that "[i]t becomes quote obvious ... that the City of Coppell does not want multi-family housing ... [because]

we really don't want a drive by shooting in our city." *Id.* at 196. Yet another resident stated, "I'm against having ... more apartments in Coppell.... In a plain word, calling a spade a spade." *Id.* at 169. Finally, during another City Council meeting, a citizen continually referred to apartment buildings as "projects" and relayed his concern that apartment complexes eventually end up as affordable housing. *Id.* at 207–08.

■ Assuming *arguendo* that these statements are manifestations of the citizens' bias against minorities, they nonetheless are insufficient to demonstrate that *the City* was motivated by race when it made the zoning and land use decisions at issue. When a municipality holds an open meeting, it may not constitutionally prohibit a citizen from speaking based on the content of his speech. *See Contreras*, 119 F.3d at 1294. Based on our Nation's ideal of open communication between citizens and their representatives, opinions expressed by private citizens are not readily imputed to public officials. *See id.* at 1291–94; *Barnes Found.*, 982 F.Supp. at 989–90 & n. 17; *Thornton*, 863 F.Supp. at 509. Instead, citizen comments can demonstrate that public officials acted with bias only if the circumstances surrounding those statements strongly suggest that the public officials either adopted the citizens' biases or acted directly in response to the citizens' discriminatory desires. *See, e.g., United States v. City of Birmingham*, 727 F.2d at 562–63. Plaintiffs have adduced evidence regarding statements made by five persons—presumably Coppell residents—who attended and spoke at City

4. Even if the evidence were admissible, plaintiffs have taken it out of context. *See* Ps. Supp. Resp. at 3. Sieb's full quotation states:

Hopefully the people that will be moving in will reflect what we have here already—they have pride of community and they are participators. They bring new and innovative ideas to problems we have here. They also increase the tax base and create more business for local merchants.

Ps. Supp.App. at 77 (internal quotation marks omitted). In other words, Sieb was saying that what Coppell has already are people with community pride, participators, instigators of new and innovative ideas, and individuals who increase the tax base and create business for local merchants. He expressed the hope that new residents would also possess the same traits. Because these characteristics do not change according to a person's race, the statement is race neutral.

meetings. The same evidence indicates that many other citizens voiced their opposition to multifamily housing based on race-neutral reasons, such as the adverse impact that dense housing facilities have on public services, traffic, and child safety. *See* Ps.App. at 192, 219, 222, 227–28, 236; Ps. Supp.App. at 206. This evidence, viewed in the aggregate, would permit a reasonable trier of fact to find only that the allegedly-biased statements composed but a small fraction of the opinions presented to the decisionmaking bodies. If this is the only evidence that plaintiffs introduce at trial (assuming it is admissible), they will fail to show that race was a consideration in the City's actions.

### 7

Having considered the evidence relevant to the *Arlington Heights* factors, the court holds that the factors in their totality are sufficient to create a genuine issue of material fact concerning whether race was a significant factor in the City's zoning and land use decisions.

### V

The parties have devoted considerable briefing, and the court focused much of its attention during the oral argument of this motion, on the issue of disparate impact. "[A] violation of the FHA may be established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect." *Simms*, 83 F.3d at 1555 (citing *Hanson*, 800 F.2d at 1386). Because the court need not decide this question to resolve the City's motion for summary judgment, the pertinent law is unsettled, and the issue presents questions that require further deliberation and that do not merit the court's withholding its ruling today, the court declines to decide this part of the City's motion and denies without prejudice summary judgment on that basis. The court does intend, however, to continue its examination of the issue for purposes of deciding a Fed.R.Civ.P. 50(a) motion for judgment as a matter of law on this issue and, if necessary, formulating the jury charge. The parties are invited to advise the court by letter of any court decisions rendered hereafter that may bear on the issue of disparate impact.

\*   \*   \*   \*   \*   \*

The City's motion for summary judgment is denied. The court will set this case for a trial docket by separate order.

**SO ORDERED.**